# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

United States of America,

    Plaintiff,      **Criminal No. 15-170 (MJD/SER)**

v.

Enrico Antonio Flemino,     **REPORT & RECOMMENDATION**

    Defendant.

_____

  Bradley M. Endicott, Esq., United States Attorney's Office, Saint Paul, Minnesota, for Plaintiff.

  Mark D. Nyvold, Esq., Fridley, Minnesota, for Defendant.

_____

STEVEN E. RAU, United States Magistrate Judge

  The above-captioned case comes before the undersigned on Defendant Enrico Antonio Flemino's ("Flemino") Motion to Suppress Evidence Obtained Through Search and Seizure ("Motion to Suppress") [Doc. No. 21]. This matter was referred for the resolution of the issues raised in Flemino's Motion to Suppress pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that the Motion to Suppress be denied.

## I.  BACKGROUND

  On June 1, 2015, Flemino was indicted on one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and one count of distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Indictment) [Doc. No. 9].

Flemino filed his Motion to Suppress on July 14, 2015, and the Court held a hearing on the motion on July 21, 2015. (Minute Entry Dated July 21, 2015) [Doc. No. 24]. No testimony was offered at the hearing, but the Court received into evidence nine exhibits. (Ex. & Witness List) [Doc. No. 25]. Government's Exhibit 1 is the application for search warrant and supporting affidavit, search warrant, and inventory for the search challenged in the Motion to Suppress. (*Id.*). Government's Exhibits 2–4 are photographs showing a garbage can and narcotics that were found in the garbage can during the search. (*Id.*). Government's Exhibits 5–9 are recent photographs taken at the search location that show the garbage can's approximate location at that time of the search. (*Id.*).[1] After supplemental briefing from the parties, Flemino's Motion to Suppress was taken under advisement on August 19, 2015. (Minute Entry Dated July 21, 2015).

---

[1]     At the motion hearing, the parties informed the Court of the possibility that they would reach a stipulation regarding additional exhibits to be submitted to and considered by the Court. *See* (Minute Entry Dated July 21, 2015). The parties were instructed to file any stipulation and exhibits on CM/ECF. (*Id.*). Despite these instructions, however, Flemino did "not submit the [exhibits] via CM/ECF because as they are being offered in the same manner the Gov[ernment] offered [exhibits] at the motion hearing, which were not filed." (Mem. Supporting Def.'s Mot. to Suppress, "Mem. in Supp.") [Doc. No. 27 at 21 n.2]. Instead, Flemino submitted exhibits, marked as Defendant's Exhibits 1–5, directly to the Court with his supplemental briefing. In addition, the parties did not file a stipulation on CM/ECF. Flemino states that "the parties have agreed that the Court may consider certain photos of tools taken at the time of their seizure, and that the Court may receive and consider them." (*Id.*). The Court's request that the parties file a stipulation and file the stipulated-to exhibits on CM/ECF was to establish a clear record for the parties and the district judge as to the evidence before the Court. Nonetheless, the Government does not dispute Flemino's assertion as to the parties' agreement and the content of the photographs, and the Court ultimately does not find Defendant's Exhibits 1–5 necessary for resolution of the dispute before the Court. *See infra* Part III.C.

## II.    FACTS[2]

On December 18, 2014, Officer Cory J. Kochendorfer ("Officer Kochendorfer") applied for a warrant to search "the premises" described as "1025 Mahtomedi Avenue, Mahtomedi, Minnesota,  a story and a half single family home, tan in color, including the detached garage, all storage sheds, out buildings and storage type containers to include all vehicles/trailers parked on the property."[3] (Kochendorfer Aff. at 1). The application also sought permission to search the persons of Brittany Wagner ("Wagner"), Stephanie Varela ("Varela"), Richard Delos Santos ("Delos Santos"), and Flemino. (*Id.*). The Kochendorfer Affidavit described a six-month investigation of Flemino, Wagner, Varela, and Delos Santos. (*Id.* at 2).

A search of police databases showed that Flemino had a Minnesota driver's license that listed his address as 1025 Mahtomedi Avenue in Mahtomedi, Minnesota, and that Flemino provided 1025 Mahtomedi Avenue as his current address elsewhere. (*Id.* at 2–3). Flemino's criminal history included a 2003 felony conviction for possession of a pistol/weapon by an ineligible person and a 2004 first-degree felony drug conviction. (*Id.* at 3). Flemino had twenty-three "[f]elony arrests between 1991 and 2014, with most being narcotic arrests."[4] (*Id.*). At the

---

[2]     The facts are based on the affidavit of St. Paul Police Officer Cory J. Kochendorfer (the "Kochendorfer Affidavit"), which is at pages one through seven of Government's Exhibit 1 and which served as the basis for the search warrant. (Gov't Ex. 1). The Court will refer to this portion of Government's Exhibit 1 as the "Kochendorfer Affidavit," and will refer to other portions of Government's Exhibit 1 (i.e., the search warrant and inventory) as necessary.

[3]     Officer Kochendorfer has been a licensed peace officer for over nine years and is an investigative officer with the St. Paul Police Narcotics Unit and the Ramsey County Violent Crime Enforcement Team ("VCET"). (Kochendorfer Aff. at 2). He is "responsible for investigating a wide variety of drug related offenses within the City of St. Paul and surrounding areas." (*Id.*).

[4]     Flemino and the Government note in their memoranda that Flemino's narcotics arrests for this time period is actually six, which is less than "most" of the twenty-three arrests as stated in the Kochendorfer Affidavit. *See* (Mem. in Supp. at 6); (Gov't Mem. in Opp'n to Def.'s Mots. to Suppress, "Mem. in Opp'n") [Doc. No. 28 at 3 n.1]. Flemino challenges probable cause and states that while "this error . . . by itself does not support a finding of no-probable cause, it is a

time officers applied for the search warrant, an active warrant for Flemino existed based on "a 2014 [first-degree narcotics] charge out of St. Paul." (*Id.*).

As to Varela, a search of police databases revealed her current address as 1025 Mahtomedi Avenue. (*Id.*). Varela's criminal history includes a fifth-degree felony narcotics conviction in 2013 and felony theft conviction in 2014. (*Id.* at 4). A sergeant informed Officer Kochendorfer that on September 17, 2014, a woman who identified herself as "Stephanie Varela" received a call from Flemino while Flemino was in the Ramsey County Jail. (*Id.* at 3). In addition, several police reports "listed" Varela as "being with" Delos Santos. (*Id.* at 4). Officer Kochendorfer found a Facebook page for a "Stephanie Varela," who was "identified as Varela," that showed pictures of Varela and Delos Santos suggesting that they were "a couple." (*Id.* at 3). Varela is Facebook "friends" with a "Brittani Wagner," who was "identified as Wagner." (*Id.*).

A search of police databases for Delos Santos showed that Delos Santos listed his most current address as 1025 Mahtomedi Avenue. (*Id.*). Delos Santos's criminal history includes the following felony convictions: (1) second-degree narcotics in 2013; (2) fourth-degree sale of narcotics in 2013; (3) fifth-degree narcotics in 2007; (4) third-degree narcotics in 2007; and (5)

---

factor to consider in assessing [his] probable-cause challenge." (Mem in Supp. at 6). But there is nothing in the record to indicate that the correction as to the actual number of Flemino's narcotics arrests was before the issuing judge, and, while the Court received into evidence exhibits related to Flemino's other challenges to the search, Flemino's probable-cause challenge is a facial challenge to the search warrant. *See* (Mem. in Supp. at 1, 3) (stating that "the affidavit supporting the warrant does not establish probable cause" and noting that the "reviewing court's duty is to ensure that the [issuing judge] had a substantial basis for . . . concluding that probable cause existed"). In these circumstances, the Court may consider only the information "found within the four corners of the affidavit" when determining whether the warrant was supported by probable cause. *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999)). Indeed, Flemino provides no legal framework for the Court's consideration of this "factor . . . in assessing [his] probable-cause challenge," nor does Flemino contend that the error constitutes an intentional or reckless false statement. *See* (Mem. in Supp. at 6); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). Therefore, the Court will not address the apparent discrepancy regarding Flemino's narcotics arrests.

fifth-degree narcotics in 2006. (*Id.*). Delos Santos's 2013 felony conviction for second-degree narcotics was the result of a Ramsey County VCET investigation, which Officer Kochendorfer participated in. (*Id.*). On June 13, 2013, officers executed a search warrant at Delos Santos and Varela's home. (*Id.* at 4). Both Delos Santos and Varela were present during the search, and controlled substances were recovered. (*Id.*).

A search of police databases for Wagner did not reveal a tie between Wagner and 1025 Mahtomedi Avenue. (*Id.*). In December 2014, however, Wagner was stopped in a vehicle near 1025 Mahtomedi Avenue and was with both Varela and Delos Santos. (*Id.* at 4, 5). Wagner was arrested in September 2013 for possession of approximately two pounds of methamphetamine and a stolen handgun. (*Id.* at 4).[5] On December 16, 2014, Wagner was arrested for "possession of a large amount of methamphetamine." (*Id.*). This methamphetamine was discovered during the execution of a search warrant at an address in St. Paul. (*Id.* at 5). Wagner was one of the suspects listed in the warrant and arrived at the St. Paul address during the search. (*Id.*). Officers "recovered approximately two ounces of suspected methamphetamine" from Wagner's purse. (*Id.*).

On September 17, 2014, Officer Herschman "orchestrated a controlled Under Cover (UC) buy for an amount of methamphetamine from a known target." (*Id.* at 4). "Flemino arrived and supplied the known target with the product, which was then delivered to" the undercover buyer or "UC." (*Id.*). "Flemino and the known target were . . . taken into custody at the time of the UC buy." (*Id.*). Another individual was also arrested as result of the controlled buy. *See* (*id.*).

---

[5]     Elsewhere in his affidavit, Officer Kochendorfer states that Wagner was found with approximately two pounds of methamphetamine and stolen handgun in September **2014**. (*Id.* at 5). Given the similar description of the contraband with which Wagner was found, it appears that one of these dates (i.e., 2013 or 2014) is incorrect. The parties, however, do not address this issue, nor is this inconsistency of consequence to the Court's analysis. *See infra.*

Flemino was charged with first-degree conspiracy to sell methamphetamine. (*Id.*). Officers conducted *Miranda* interviews with "the two known arrested parties from [the] . . . UC methamphetamine buy." (*Id.*). These two known individuals were James Skrypek ("Skrypek") and Matthew Hogan ("Hogan"). (*Id.*).

During their *Miranda* interviews, Skrypek and Hogan "both stated that [they] had been involved in dealing narcotics that came directly from Flemino." (*Id.*). Skrypek stated that on September 17, 2014, "he was contacted by Flemino who told him to pick him up at his (Flemino's) house in Mahtomedi." (*Id.*). Skrypek went to Flemino's house and picked up Flemino. (*Id.*). "Skrypek told Officer Herschman that he was given an amount of narcotics from Flemino, while at the deal location, that was to be sold to Hogan . . . which in turn was to be sold to the UC." (*Id.*). Skrypek reported that he was to be compensated for his role in the transaction. (*Id.*). Hogan told Officer Herschman that, before the transaction, Hogan went to Flemino's house in Mahtomedi to "retrieve narcotics for" the transaction, but he "did not have money to pay for the narcotics while at Fleminos [sic] house." (*Id.*). Hogan stated he was also to be compensated for his role in the transaction. (*Id.*).

In light of suspected narcotics activity at 1025 Mahtomedi Avenue, the Washington County Sheriff's Department watched the premises. (*Id.* at 5). On or about September 10, 2014, a vehicle was stopped leaving 1025 Mahtomedi Avenue; the driver was identified as Delos Santos. (*Id.*). On September 18, 2014, deputies stopped a vehicle. (*Id.*). The male driver stated that "he was going to 1025 Mahtomedi Avenue to score meth" and stated that he "did not want to comment any further" for fear of retaliation. (*Id.*). On or about December 1, 2014, a "rental vehicle was observed leaving 1025 Mahtomedi Avenue," and the vehicle was later stopped. (*Id.*). The driver was identified as Wagner, and the passengers were identified as Delos Santos and

Varela. (*Id.*). Varela informed authorities that "she drives a white BMW 750 bearing Minnesota license plate 742-PJE." (*Id.*). A deputy had observed Delos Santos driving the same BMW "[o]n a prior date." (*Id.*). A Freeborn County narcotics agent reported that Delos Santos was "involved in narcotics trafficking in the Albert Lea area as well [as the] Twin Cities Metro Area." (*Id.* at 6). The agent stated that Delos Santos's white BMW was seen in Albert Lea on December 17, 2014. (*Id.*).

In addition to the above information, officers obtained information from two confidential reliable informants ("CRIs") and three confidential informants ("CIs"). Within seventy-two hours prior to the application for the search warrant, Officer Kochendorfer and Officer Holter "received information from CRI-1 that Flemino [was] selling multiple pounds of methamphetamine" and was dating Wagner. (*Id.* at 5). CRI-1 stated that Wagner stayed at Flemino's home "on and off" and was also selling "pounds of methamphetamine." (*Id.*).

Within two weeks prior to the application for the search warrant, Officer Holter showed CRI-2 "a colored photograph of Flemino with no writing on it." (*Id.*). CRI-2 "confirmed the photograph to be of Flemino," who, according to CRI-2, "sells pounds of methamphetamine" and "dat[es] Brittany Wagner." (*Id.*). Officer Holter also showed CRI-2 a "colored photograph of Varela with no writing on it" and CRI-2 stated that the photograph was of an individual who had "delivered narcotics to Wagner in the past, which led to the recovery of a large amount of suspected methamphetamine." (*Id.*).

Within seventy-two hours prior to the application for the search warrant, officers received information from CI-1, who stated that s/he "knows Flemino lives at 1025 Mahtomedi Avenue and stated he sells multiple pounds of methamphetamine." (*Id.*). CI-1 further reported that "Flemino stores his product and proceeds outside the home hidden in vehicles, storage areas, and

possibly containers buried on the property" and that s/he had been at 1025 Mahtomedi Avenue with Flemino within the last twenty-four hours. (*Id.*). CI-1 reported that as s/he arrived at 1025 Mahtomedi Avenue, "a white BMW driven by Richard was pulling out of the driveway." (*Id.*). When CI-1 was at the home meeting with Flemino, Flemino was "counting a large amount of US currency which had been dropped off by Richard." (*Id.*). According to CI-1, "Richard" was "dating Flemino's nanny Stephanie and both Richard and Stephanie have access to a storage locker at a nearby facility that contains Flemino's methamphetamine and money."[6] (*Id.*). CI-1 was shown a "colored photograph of [Delos] Santos with no writing on it" and stated that the pictured individual was "Richard," the "nanny's boyfriend" who drove the white BMW. (*Id.*). CI-1 also viewed a photograph of Varela, with no writing on it, and identified the pictured individual as "Stephanie the nanny" who is "Richard's girlfriend." (*Id.*).

Within the seventy-two hours prior to the search warrant application, CI-2 reported that "Wagner [was] dating Flemino and often stays at his house." (*Id.* at 6). This CI did not know Flemino "very well" but stated that Flemino "sells large amounts of methamphetamine." (*Id.*). At some point in time, CI-3 told a Drug Enforcement Agency task force officer, Officer Sand, that "Flemino is a pound level methamphetamine dealer who lives at 1025 Mahtomedi Ave[nue]," which was relayed to Officer Holter within forty-eight hours before the application for the search warrant. (*Id.*).

Officer Kochendorfer stated that he believed the CRIs and CIs were "extremely reliable" because past information provided by the CRIs and CIs had "proven to be true and correct through independent corroborative investigation." (*Id.* at 7).

---

[6]     Richard is Delos Santos's first name, and Stephanie is Varela's first name. (Kochendorfer Aff. at 1).

### III.   DISCUSSION

Flemino challenges the validity of the search of the premises at 1025 Mahtomedi Avenue on several grounds. (Mot. to Suppress at 1–5); (Mem. in Supp. at 1–2). First, Flemino argues that the search warrant was unsupported by probable cause because the information in the Kochendorfer Affidavit was conclusory, speculative, unreliable, stale, and failed to show a sufficient nexus between methamphetamine or other drug-related evidence and 1025 Mahtomedi Avenue. (Mot. to Suppress at 1–5); (Mem. in Supp. at 1, 3–18). Second, he argues that officers exceeded the scope of the warrant by searching a garbage can located in the yard near the front right corner of the residence. (Mot. to Suppress at 5); (Mem. in Supp. at 19–20). Third, he argues that officers exceeded the scope of the warrant by seizing tools from a trailer located on the property. (Mot. to Suppress at 5); (Mem. in Supp. at 21–23). Finally, Flemino argues that the good-faith exception does not apply. (Mem. in Supp. 23–26).

### A.   Probable Cause

#### 1.   Legal Standard

In determining whether probable cause exists to issue a search warrant, a court considers the information that was before the issuing judicial officer and affords "great deference to the issuing judge's determination." *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009). When evaluating the probable cause determination of the issuing court, "the duty of the reviewing court is simply to ensure that the issuing court had a substantial basis for concluding that probable cause existed." *United States v. Mims*, 567 F. Supp. 2d 1059, 1067 (D. Minn. 2008) (Rosenbaum, J., adopting report and recommendation of Mayeron, Mag. J.). Where no evidence outside of the affidavit was submitted to the issuing judge, "only that information which is found within the

four corners of the affidavit may be considered in determining the existence of probable cause." *Solomon*, 432 F.3d at 827 (quoting *Etheridge*, 165 F.3d at 656).

Probable cause exists when the likelihood of finding evidence of a crime in a certain place is fairly probable. *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002). "Probable cause . . . does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (quoting *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001)). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant . . . ." *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007). Determining whether probable cause exists is a practical, common sense decision. *Mims*, 567 F. Supp. 2d at 1067.

When an affidavit submitted in support of a warrant is "based on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant to whether the affidavit provided probable cause to support the search." *Solomon*, 432 F.3d at 827. The credibility and reliability of the informant are important factors for determining probable cause, but they are not separate and independent requirements from the totality-of-the-circumstances approach. *United States v. LaMorie*, 100 F.3d 547, 553 (8th Cir. 1996); *see Illinois v. Gates*, 462 U.S. 213, 230 (1983). "Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." *Mims*, 567 F. Supp. 2d at 1067–68 (citing *United States v. Williams,* 10 F.3d 590, 594 (8th Cir. 1993)). Courts have found an informant's information credible and reliable when the information is based on his or her first-hand observations, when the informant has provided evidence against his or her penal interest, or

when the informant's information is corroborated by another informant or the investigating officers. *Mims*, 567 F. Supp. 2d at 1068; *see, e.g.*, *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (noting that "corroboration of minor, innocent details can suffice to establish probable cause"); *United States v. Fulgham,* 143 F.3d 399, 401 (8th Cir. 1998) ("[T]he information given by the first informant was corroborated with specific, consistent details provided by the second informant."). "Law enforcement may use a suspect's criminal history or evidence of prior unlawful activity to corroborate information provided by informants." *Mims*, 567 F. Supp. 2d at 1075.

In addition, "there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). In other words, "[p]robable cause exists when the facts and circumstances . . . are sufficiently trustworthy to warrant a person of reasonable caution to believe that a crime has been committed and that seizable property from that crime may be located at a particular place or on a person to be searched." *United States v. Gipp*, 147 F.3d 680, 687 (8th Cir. 1998).

Finally, probable cause "must exist when a warrant is issued, not merely at some earlier time." *LaMorie,* 100 F.3d at 554. There is, however, no bright-line test for determining when information is stale. *United States v. Koelling,* 992 F.2d 817, 822 (8th Cir. 1993). "[T]he lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." *United States v. Horn,* 187 F.3d 781, 786 (8th Cir. 1999). In cases involving "patterned drug trafficking," courts acknowledge that "older information is not necessarily stale due to the ongoing nature of the crimes." *Mims*, 567 F. Supp. 2d at 1070. Moreover, when newer information corroborates otherwise stale information,

probable cause may be found. *Id.*; *see also United States v. Kattaria*, 553 F.3d 1171, 1176 (8th Cir. 2009).

### 2.   Analysis

#### a.   CRIs and CIs

Considering the totality of the circumstances presented in the Kochendorfer Affidavit, the Court concludes that the search warrant was supported by probable cause. Flemino's predominant challenge to probable cause is that the affidavit fails to establish that the information from the CRIs and CIs was reliable. *See* (Mem. in Supp. at 6–10, 15, 17–18). This challenge, however, fails to account for the totality of circumstances presented in the affidavit, which, even without the information provided by the CRIs and CIs would be sufficient to establish probable cause. Moreover, Flemino's argument ignores the variety of factors that bear on the reliability of an informant. *See Mims*, 567 F. Supp. 2d at 1067–68. When evaluated as a whole, the Kochendorfer Affidavit contains sufficient corroborative information to permit the issuing judge to find the CRIs and CIs reliable.

CRI-1 reported that: (1) Flemino was selling large amounts of methamphetamine; (2) Flemino was dating Wagner; (3) Wagner stayed at Flemino's home on and off; and (4) Wagner was selling large amounts of methamphetamine. (Kochendorfer Aff. at 5). While the affidavit does not state the basis for CRI-1's knowledge, the information offered by CRI-1 is consistent with what police learned through their investigation. Specifically, a search of police databases revealed that Flemino has a criminal history involving narcotics-related offenses. (*Id.* at 3). Likewise, the affidavit recounts Wagner's recent arrests for narcotics-related activity, both of which involved Wagner's possession of suspected methamphetamine. (*Id.* at 4–5). This information corroborates CRI-1's statements regarding Flemino's and Wagner's involvement in

narcotics activity. *Mims*, 567 F. Supp. 2d at 1075 ("Law enforcement may use a suspect's criminal history or evidence of prior unlawful activity to corroborate information provided by informants.").

In addition on September 17, 2014, approximately three months before the application for the search warrant, Flemino was involved in a controlled buy with an undercover officer, Skrypek, and Hogan. The affidavit states: "Flemino arrived and supplied the known target with the product which was then delivered to the UC." (Kochendorfer Aff. at 4). Flemino appears to contend that this statement should not be credited because "the affiant gives no source for this information, attributing it neither to" Officer Herschman, who orchestrated the controlled buy, "nor anyone else." (Mem. in Supp. at 11). This statement, however, is provided in a paragraph discussing the controlled buy. (Kochendorfer Aff. at 4). A fair and common sense reading of this paragraph and the paragraph that follows demonstrates that the source of this information was either Officer Herschman, the undercover officer, Skrypek, and/or Hogan. (*Id.*). Flemino does not explain why any of the above individuals would be unable to reliably recount Flemino's involvement in the controlled buy, and any ambiguity about the particular source of this specific statement does not meaningfully impact the probable cause analysis.

Indeed, both Skrypek and Hogan provided additional, consistent information during *Miranda* interviews following the controlled buy. Both stated that they "had been involved in dealing narcotics that came directly from Flemino" and further described the events that occurred leading up to and during the controlled buy. (*Id.*) (noting that "Skrypek told Officer Herschman that he was given an amount of narcotics from Flemino, while at the deal location, that was to be sold to . . . Hogan . . . which in turn was to be sold to the UC" and that "Hogan told Officer Herschman" that he was supposed to be paid for his role in the transaction "which was

13

subsequently done with a UC").[7] The information obtained through the controlled buy further corroborates CRI-1's statement that Flemino was involved in the sale of methamphetamine. *See Fulgham*, 143 F.3d at 401 (concluding that "five-month-old police report described in the affidavit" corroborated the informants' claims); *Mims*, 567 F. Supp. 2d at 1067 (stating that informant's reliability may be established "if it is corroborated by independent evidence" (quoting *Williams*, 10 F.3d at 594)). And CRI-1's statement that Flemino was selling methamphetamine is further corroborated by the fact that on September 18, 2014, a vehicle was stopped on its way to 1025 Mahtomedi Avenue—Flemino's confirmed address—with the driver's stated purpose being "to score meth." (Kochendorfer Aff. at 1, 5). Finally, CRI-1's statement that Wagner stayed at Flemino's home "on and off" is at least partially corroborated by the fact that on December 1, 2014, a rental vehicle driven by Wagner was observed leaving 1025 Mahtomedi Avenue. (*Id.* at 5).

As the above discussion demonstrates, independent evidence corroborated much of CRI-1's information. When "information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable." *Mims*, 567 F. Supp. 2d at 1068 (quoting *Williams*, 10 F.3d at 594); *see also Buchanan*,

---

[7] Flemino does not expressly challenge the credibility or reliability of Hogan or Skrypek, but the Court nonetheless notes the indicia of reliability that accompany their statements. Their statements were made against their penal interest, were based on the first-hand observations of events surrounding the controlled buy, and were made during *Miranda* interviews, suggesting that the statements were made during a face-to-face interaction with officers. *See United States v. Buchanan*, 574 F.3d 554, 561–62 (8th Cir. 2009) (noting the "indicia of reliability in the richness and detail of a first-hand observation" and that "[t]he circumstances of personal questioning may also enhance reliability and credibility"); *United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir. 2008) (noting that in-person questioning provides law enforcement with an opportunity to assess credibility); *Tyler*, 238 F.3d at 1039 (stating that statements against penal interest are "presumptively credible").

574 F.3d at 562 ("Even the corroboration of minor, innocent details can suffice to establish probable cause." (quoting *Tyler*, 238 F.3d at 1039)).

Similar to the information CRI-1 provided, CRI-2, CI-1, CI-2, and CI-3 all stated that Flemino sells significant amounts of methamphetamine. (Kochendorfer Aff. at 5–6). Like CRI-1's tip about Flemino's involvement in the sale of methamphetamine, these statements by the other informants are corroborated by the above-discussed independent evidence. Also, all of the informants consistently reported that Flemino was selling methamphetamine, as opposed to other narcotics; CI-1 and CI-3 identified Flemino's address as 1025 Mahtomedi Avenue; and CRI-1, CRI-2, and CI-2 all reported that Flemino was dating Wagner, making their tips reciprocally corroborative. *See Fulgham*, 143 F.3d at 401 (concluding that information "given by the first informant was corroborated with specific consistent details provided by the second informant").

In addition, CRI-2 accurately identified Flemino in a photograph and identified Varela in a photograph as the person who "delivered narcotics to Wagner in the past."[8] (Kochendorfer Aff. at 5). CI-1 identified Varela by photograph as being Delos Santos's girlfriend, further stating that

---

[8]    CRI-2 identified Varela as the person who "delivered narcotics to Wagner in the past, **which led to the recovery [of] a large amount of suspected methamphetamine.**" (Kochendorfer Aff. at 5) (emphasis added). The Government reads the emphasized language as stating that at some point in time, CRI-2's information about Varela led directly to the discovery of a large amount of suspected methamphetamine, therefore providing information about CRI-2's track record. *See* (Mem. in Opp'n at 9); *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998) (concluding that affidavit "established the informant's track record and hence, his reliability" when affiant stated that the confidential informant had "proven his/her reliability in the past by making controlled purchase[s] of crack cocaine under the direct supervision of affiant officers"). Conversely, Flemino appears to contend that CRI-2 simply told officers that the previous delivery of narcotics from Varela to Wagner ended with the recovery of narcotics, but did not explain his or her involvement in the recovery of narcotics, if any. (Mem. in Supp. at 8). The Kochendorfer Affidavit is ambiguous on this point, but the Court need not resolve the ambiguity because, as described above, other information in the affidavit established CRI-2's reliability. *See Williams*, 10 F.3d at 593 ("Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, **or** if it is corroborated by independent evidence." (emphasis added)).

Delos Santos and Varela had access to a storage locker containing Flemino's money and methamphetamine. (*Id.*). When considered along with all of the other information in the Kochendorfer Affidavit, including information obtained through independent investigation that connected Delos Santos and Varela to one another, to Flemino, to Wagner, to 1025 Mahtomedi Avenue, and to past illegal drug activity, these circumstances further support a finding of probable cause. *See* (Kochendorfer Aff. at 3–4); *Tyler*, 238 F.3d at 1039 (stating that a court "must weigh an informant's statement in the context of all of the circumstances").

Finally, CI-1 reported having been with Flemino at 1025 Mahtomedi Avenue within the twenty-four hours preceding the application for the search warrant. (Kochendorfer Aff. at 5). CI-1 stated that as s/he arrived, a white BMW driven by Delos Santos was leaving 1025 Mahtomedi Avenue, and stated that when s/he met with Flemino he was "counting a large amount of US currency which had been dropped off by Richard" (i.e., Delos Santos). (*Id.*). CI-1 further reported that "Flemino stores his product and proceeds outside the home hidden in vehicles, storage areas, and possibly containers buried on the property." (*Id.*). In addition to the corroboration of CI-1's information as discussed above, CI-1's statement that s/he observed Delos Santos driving a white BMW is consistent with officers' information that Varela, Delos Santos's girlfriend, drives a white BMW, and the report that a deputy observed Delos Santos driving the same BMW "[o]n a prior date." (*Id.*). Also, CI-1's statement that Flemino was in possession of a large amount of U.S. currency was based on CI-1's first-hand observations while at 1025 Mahtomedi Avenue with Flemino, lending credibility to the statement. *Buchanan*, 574 F.3d at 561–62; *Mims*, 567 F. Supp. 2d at 1068. Drawing reasonable inferences from the circumstances presented in the affidavit, the issuing judge could infer that the large amount of

currency may be associated with the sale of narcotics, further supporting a finding of probable cause. *See Summage*, 481 F.3d at 1078.

Flemino makes much of the fact that the affidavit states that CI-1 reported that "Richard" (i.e., Delos Santos) dropped off the currency, but "does not say how the CI learned [Delos Santos] had dropped it off." (Mem. in Supp. at 15). Similarly, Flemino notes that the affidavit fails to explain how CI-1 knew that Delos Santos and Varela had access to a storage locker containing Flemino's methamphetamine and money and elsewhere doubts CI-1's report that Flemino stores his "product and proceeds" outside his house in vehicles, storage areas, or containers buried on the property. *See* (*id.* at 15, 19). But, "an informant's reliability and basis of knowledge 'are better understood as relevant considerations in the totality-of-the-circumstances analysis that has traditionally guided probable-cause determinations'" and "a deficiency in one may be compensated for, in determining overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *United States v. Olson*, 21 F.3d 847, 850 (8th Cir. 1994) (quoting *Gates*, 462 U.S. at 233) (holding that "notwithstanding the lack of a basis of knowledge for the informants' information," including a lack of dates, specific events, or explanations, other evidence corroborated informants' information and supported a finding of probable cause). As previously discussed, CI-1's information is corroborated by independent evidence, as well as by other informants, and when "information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though

uncorroborated, is also reliable." *Mims*, 567 F. Supp. 2d at 1068 (quoting *Williams*, 10 F.3d at 594).[9]

### b.      Nexus and Staleness

In addition to his challenge to probable cause based on the reliability of the informants, Flemino argues that the Kochendorfer Affidavit fails to provide probable cause because it fails to establish a sufficient nexus between evidence of illegal narcotics activity and 1025 Mahtomedi Avenue and because the information in the affidavit was stale. (Mem. in Supp. at 7, 10–17). The Court finds these arguments to be without merit.

The Kochendorfer Affidavit establishes a connection among Flemino, Wagner, Varela, and Delos Santos, sets forth each individual's history of illegal narcotics activity, and demonstrates a current connection between each individual and 1025 Mahtomedi Avenue. *See generally* (Kochendorfer Aff.). Just three months before the application for the search warrant, Skrypek, who was arrested after the controlled buy, stated that he picked Flemino up at his "house in Mahtomedi" and that he received "an amount of narcotics from Flemino, while at the deal location." (*Id.* at 4). Hogan, who was also arrested following the controlled buy, stated that

---

[9]      This same analysis applies to any other argument with respect to the informants' basis of knowledge. In addition, because the Kochendorfer Affidavit provides sufficient information establishing the reliability of the CRIs and CIs, the Court need not address Flemino's argument that Officer Kochendorfer's general statement at the close of the warrant that he believed the CRIs and CIs were "extremely reliable" because past information provided by the CRIs and CIs had "proven to be true and correct through independent corroborative investigation," by itself, fails to establish the reliability of the informants. *See* (Kochendorfer Aff. at 7); (Mem. in Supp. at 9).

Moreover to the extent Flemino challenges probable cause by identifying broad statements in the warrant about what the officers' investigation revealed and by contending that such statements are conclusory or speculative, his argument is without merit. *See* (Mem. in Supp. at 5). These general statements must be viewed in the context of the other information provided in the Kochendorfer Affidavit.

he went to Flemino's house in Mahtomedi to "retrieve narcotics for" the transaction, but he "did not have money to pay for the narcotics while at Fleminos [sic] house." (*Id.*).

Flemino argues that this information fails to establish a nexus with 1025 Mahtomedi Avenue because Skrypek and Hogan never stated that they saw or received narcotics at Flemino's house. (Mem. in Supp. at 12). But these facts must be considered under the totality of the circumstances, and the issuing judge could draw reasonable, common sense inferences from these facts. *Summage*, 481 F.3d at 1078; *Mims*, 567 F. Supp. 2d at 1067. The fact that Flemino was picked up at his "house in Mahtomedi" and later provided Skrypek with narcotics at the deal location and the fact that Hogan went to Flemino's house in Mahtomedi intending to obtain narcotics permitted the issuing judge to conclude that it was fairly probable that narcotics would be found at 1025 Mahtomedi Avenue. *Cf. United States v. Bulgatz*, 693 F.2d 728, 731 (8th Cir. 1982) ("[I]ssuing magistrates need not base their findings of probable cause on facts alleging direct observation of criminal activity but may base their findings on normal inferences drawn from the surrounding circumstances and allegations of fact as well as the type of crime.").

In addition, approximately three months before the application for the search warrant, a vehicle was stopped on its way to 1025 Mahtomedi Avenue, and the driver stated that "he was going to 1025 Mahtomedi Avenue to score meth." (Kochendorfer Aff. at 5). Finally, within the twenty-four hours preceding the application for the search warrant, CI-1 met with Flemino at his home where Flemino was "counting a large amount of US currency" and stated that Flemino stores his "product and proceeds" outside the home in vehicles, storage areas, and containers buried on the property. (*Id.*).

The above facts, considered under the totality of the circumstances, establish a sufficient nexus between seizable evidence and the premises at 1025 Mahtomedi Avenue and provide a

substantial basis for concluding that probable cause existed at the time the search warrant was issued.[10] *See LaMorie,* 100 F.3d at 554 (noting that probable cause "must exist when a warrant is issued, not merely at some earlier time"); *Mims,* 567 F. Supp. 2d at 1069–70 (noting that older information regarding continuing patterns of drug activity is "not necessarily stale due to the ongoing nature of the crimes" and that new information corroborating otherwise stale information may support a finding of probable cause); *United States v. Nagorski*, Criminal No. 06-105 (ADM/AJB), 2006 WL 1888494, at *1 (D. Minn. July 7, 2006) (Montgomery, J., adopting report and recommendation of Boylan, Mag. J.) (finding sufficient nexus between drug trafficking and residence when warrant application contained "evidence of a continuing course of criminal activity by [defendant]," even if defendant's residence "was not involved in each instance of ongoing criminal activity").

In sum, the Court concludes that the Kochendorfer Affidavit provided a substantial basis for the issuing court to determine that the search warrant was supported by probable cause.

### B.      Search of the Garbage Can

#### 1.      Legal Standard

The Fourth Amendment imposes a particularity requirement. *United States v. Pennington*, 287 F.3d 739, 744 (8th Cir. 2002). A warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." *Id.* (alteration in original). The

---

[10]      Flemino's suggestion that the Kochendorfer Affidavit failed to establish a sufficient connection with 1025 Mahtomedi Avenue because CI-1 stated that Varela and Delos Santos had "access to a storage locker at a nearby facility that contains Flemino's methamphetamine and money" is unpersuasive. *See* (Kochendorfer Aff. at 5); (Mem. in Supp. at 15–16). CI-1 also stated that he saw Flemino with a large amount of U.S. currency when he met with Flemino at 1025 Mahtomedi Avenue and that Flemino stores money and narcotics in vehicles and containers on the property. (Kochendorfer Aff. at 5). That Flemino may have also kept money and narcotics in another location does not preclude a finding that there was a fair probability that money, narcotics, and other evidence of illegal narcotics activity would be found at 1025 Mahtomedi Avenue.

particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.* (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). "The authority to search granted by any warrant is 'limited to the specific places described in it and does not extend to additional or different places.'" *Id.* (*United States v. Alberts*, 721 F.2d 636, 639 (8th Cir. 1983)).

The "requirement that a search warrant describe its objects with particularity is a standard of 'practical accuracy' rather than a hypertechnical one." *United States v. Peters*, 92 F.3d 768, 769–70 (8th Cir. 1996) (quoting *United States v. Lowe*, 50 F.3d 604, 607 (8th Cir. 1995)). When a warrant "'specifically mentions' certain structures, it 'authorizes a search of these structures and, by implication, any other vehicles, structures, or property not noticeably separate from them,'" and "[a] warrant to search at a street address includes authority to search the yard." *Pennington*, 287 F.3d at 744–45 (quoting *United States v. Schroeder*, 129 F.3d 439, 441–42 (8th Cir. 1997)).

### 2.   Analysis

Flemino argues that even if the warrant was supported by probable cause, officers went beyond the scope of the warrant when they searched a garbage can on the property. (Mem. in Supp. at 19). The search warrant was issued for "the following described premises":

> 1025 Mahtomedi Avenue, Mahtomedi Minnesota, a story and a half single family home, tan in color, including the detached garage, and all storage sheds, out buildings and storage type containers to include all vehicles/trailers parked on the property. This property is located on the west side of Mahtomedi Avenue between Kale Street and Juniper Street.

(Gov't's Ex. 1 at 8). The issuing judge found probable cause to believe that the described evidence was "at the above-described premise" and commanded a search of the "described

premises." (*Id.* at 9). The garbage can that was searched was located in the front yard, near the driveway and front right corner of the residence. (Gov't's Exs. 2, 5, 6, 7, 8, 9).

Flemino argues that the warrant "did not specify" that the garbage can was "an item that could be searched, and . . . the warrant-affidavit did not otherwise state probable cause to search it." (Mem. in Supp. at 19). More specifically, Flemino argues that because the warrant specifically included language permitting the search of "storage type containers to include all vehicles/trailers parked on the property" the warrant "limited the search outside the residence to storage type containers, which cannot reasonably be read to include a garbage container." (*Id.* at 20). That is, Flemino contends that "the warrant by implication did not permit the search of other containers, such as those containing garbage." (*Id.*). Based on this language in the warrant, Flemino argues, "*Pennington*'s statement that a warrant authorizing a search of a street address also authorized a search of the yard does not apply." (*Id.*). The Court disagrees.

Flemino's cites no authority in support of his contention that the warrant's reference to "storage type containers to include all vehicles/trailers parked on the property" should be construed narrowly to preclude a garbage can, nor does the applicable legal standard support this position. The "requirement that a search warrant describe its objects with particularity is a standard of 'practical accuracy' rather than a hypertechnical one." *Peters*, 92 F.3d at 769–70 (quoting *Lowe*, 50 F.3d at 607). The general term "storage type containers" reasonably includes a garbage can, which, after all, is a container that stores garbage. Therefore, the term "storage type containers" "adequately covered the search" of the garbage can. *See* (Gov't's Ex. 1 at 8); *Peters*, 92 F.3d at 770 (concluding that the term "records" sufficiently covered search and seizure of audio tapes); *see also United States v. Johnson*, 640 F.3d 843, 846 (8th Cir. 2011) (rejecting defendants "constricted reading" of the term "occupant" in warrant).

Moreover, when a warrant "'specifically mentions' certain structures, it 'authorizes a search of these structures and, by implication, any other vehicles, structures, or property not noticeably separate from them" and "[a] warrant to search at a street address includes authority to search the yard." *Pennington*, 287 F.3d at 744–45 (quoting *Schroeder*, 129 F.3d at 441–42). The warrant specifically mentioned the single-family home at 1025 Mahtomedi Avenue, and the garbage can was located in the yard near the front right corner of the home. (Gov't's Ex. 1 at 8–9); (Gov't's Exs. 2, 5, 6, 7 8, 9). The garbage can was thus not "noticeably separate" from the residence, was in the yard of the street address, and was therefore within the scope of the warrant. *See Pennington*, 287 F.3d at 745 (concluding that search of "two closed buckets lying in the weeds outside" a metal outbuilding that was specifically mentioned in the warrant was within the scope of the search warrant); *see also United States v. Dunn*, 723 F.3d 919, 929 (8th Cir. 2013) (concluding that "the attached garage and the vehicle within it were not noticeably separate from the rest of the house and were therefore included in the warrant's scope").

Flemino contends *Pennington* does not permit the search of the garbage can. (Mem. in Supp. at 20). He contends that the search warrant, "by implication" prohibited the search of "other containers, such as those containing garbage" because it "limited the search outside the residence to storage type containers." (*Id.*). Even if the Court agreed with Flemino that the term "storage type containers" does not include a garbage can, the Court cannot agree that the warrant prohibited a search of the garbage can by implicitly limiting the search outside the residence to storage type containers. The search warrant authorized the search of the "premises" at 1025 Mahtomedi Avenue, "including the detached garage, and all storage sheds, outbuildings, and storage type containers to include all vehicles/trailers parked on the property." (Gov't's Ex. 1 at 8). When a search warrant describes the place to be searched as "'the premises' or 'the property'

at" a street address it "authorize[s] a search of any buildings found on those premises." *See Pennington*, 287 F.3d at 744 (suggesting that "premises" is broader than the term "residence"). Indeed, even where vehicles are "not specifically listed in [a] warrant as places to be searched, 'a vehicle found on a premises . . . is considered to be included within the scope of the warrant authorizing a search of that premises.'" *Id.* at 745 (quoting *United States v. Reivich*, 793 F.2d 957, 963 (8th Cir. 1986)); *see also United States v. Montgomery*, 527 F.3d 682 (8th Cir. 2008) ("Police may lawfully search all buildings, containers, and vehicles on the property to be searched in which the contraband sought might be found."); *Black's Law Dictionary*, Premises (10th ed. 2014) (defining premises as a "house or building, **along with its grounds**") (emphasis added).

Because the search warrant authorized the search of the **premises** at 1025 Mahtomedi Avenue, it authorized a search of the grounds, and any buildings, containers, or vehicles on the premises in which contraband might be found, including the garbage can located in the yard just outside the home. *See United States v. Long*, 449 F.2d 288, 294 (8th Cir. 1971) (finding "no merit" to argument for suppression of "trash barrel and its contents" where the warrant "described the area to be searched as 'the premises commonly known as Tocco Bros. Sea Food Co.'" at a particular address, with a description of the building, because "for all practical purposes this trash can was a part of the 'premises' to be searched"); *see also Montgomery*, 527 F.3d at 687; *Pennington*, 287 F.3d 739 at 745. The fact that the search warrant describes "the premises" to be searched as "1025 Mahtomedi Avenue, . . . a story and a half single family home, . . . **including** the detached garage, and all storage sheds outbuildings and storage type containers to include all vehicles/trailers on the property," does not **preclude** officers from searching other parts of "the premises" at 1025 Mahtomedi Avenue. *See* (Gov't's Ex. 1 at 8);

*Pennington*, 287 F.3d at 745 ("Though these vehicles were not specifically listed in the warrant as places to be searched, 'a vehicle found on a premises . . . is considered to be included within the scope of the warrant authorizing a search of that premises.'" (quoting *Reivich*, 793 F.3d at 963)); *see also United States v. Griffin*, 827 F.2d 1108, 1114–15 (7th Cir. 1987) (concluding that where the warrant "expressly authorized a search of 'the premises' . . . the specific mention of the 'house' and the 'garage' does not limit the scope of the search to those specific areas, but instead makes the premises to be searched more readily identifiable"). This plain reading of the warrant is consistent with the fact that the particularity requirement is a practical, rather than hypertechnical, standard. *Peters*, 92 F.3d at 769–70.

In sum, the Court concludes that officers did not exceed the scope of the warrant in searching the garbage can.[11]

## C.     Seizure of the Tools

Flemino's third argument is that during the course of the search, officers unlawfully seized tools from a trailer located on the property. (Mem. in Supp. at 21). Specifically, Flemino argues that while officers were permitted to search the trailer, "tools" were not among the items permitted to be seized under the search warrant and the warrant did not provide probable cause to support their seizure. (*Id.* at 21–22). In addition, Flemino argues the plain view exception cannot justify seizure of the tools.[12] (*Id.* at 22–23).

---

[11]     To the extent Flemino's challenge to the search of the garbage can is based on the reliability of CI-1 and his or her statement that Flemino stores narcotics and money in vehicles, storage areas, or containers outside the home, this issue is addressed above. *See supra*, Part III.A.2.

[12]     It appears there has been an allegation that the seized tools are stolen property, though the nature and source of this allegation are unclear. *See* (Mem. in Supp. at 21) (noting only that the tools are "allegedly stolen").

The Government states that it "will not be seeking admission of these items." (Mem. in Opp'n at 6 n.2). Despite the Government's statement, Flemino argues that "litigating the legality of the tool's seizure cannot wait until trial, and so must be addressed now." (Mem. in Supp. at 21). The Court appreciates Flemino's desire to resolve all suppression issues before trial but in light of the Government's representation, there is no dispute about admission of the tools before the Court. (Mem. in Opp'n at 6 n.2). The Court therefore recommends denying Flemino's Motion to Suppress without prejudice to the extent he seeks suppression of the tools.[13]

### D.    Good-Faith Exception

In arguing that the search was in violation of the Fourth Amendment, Flemino also argues that the good-faith exception to the exclusionary rule as set forth in *United States v. Leon*, 468 U.S. 897 (1984), does not apply in this case. (Mem. in Supp. at 23–26). Because the Court rejects all of Flemino's challenges to search warrant, the Court does not conduct a separate analysis of whether the good-faith exception applies. *See Leon*, 468 U.S. at 922–23; *see also Mims*, 567 F. Supp. 2d at 1072 (noting that finding probable cause to support search warrant rendered good-faith-exception argument moot).

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Enrico A. Flemino's Motion to Suppress Evidence Obtained Through Search and Seizure [Doc. No. 21] be **DENIED**.

---

[13]    In the event that the Government later seeks admission of the tools in this matter, nothing in this Report and Recommendation prevents Flemino from seeking appropriate relief.

Dated: September 16, 2015

*s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

## Notice

Filing Objections: This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.